IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MICHAEL P. HINSON                                                    PLAINTIFF

           v.                          Civil No. 08-5072

SHERIFF KEITH FERGUSON,
Benton County, Arkansas; MAJOR
GENE DRAKE, Benton County
Detention Center; CAPTAIN
HUNTER PETRAY, Benton County
Detention Center; DEPUTY
ZACHARY JOHNSTON;
DR. HUSKINS; and NURSE SMITH                                      DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Michael P. Hinson (hereinafter Hinson), brings this *pro se* civil rights action

pursuant to 42 U.S.C. § 1983. Hinson contends his constitutional rights were denied while he

was incarcerated at the Benton County Detention Center. Specifically, he contends excessive

force was used against him by Deputy Johnston, he was subjected to unconstitutional conditions

of confinement, and he was denied adequate medical care.

Defendants filed a motion for summary judgment (Doc. 29). To assist Hinson in

responding to the motion, I entered an order (Doc. 34) directing Hinson to complete, sign, and

return the attached questionnaire that would serve as his response to the summary judgment

motion. Hinson filed a timely response to the court's questionnaire (Doc. 36). The case is

currently before the undersigned for the issuance of a report and recommendation on the

summary judgment motion.

-1-

## I. BACKGROUND

Hinson was booked into the Benton County Detention Center (BCDC) on January 16, 2008, on pending criminal charges. *Plaintiff's Response* (hereinafter *Resp.*)(Doc. 36) at ¶ 1. As part of the booking process, Hinson completed a medical questionnaire. *Defts' Ex.* 2, Vol. 1 at page 1. Hinson did not indicate he had any health problems nor did he indicate he was on any special diet. *Id.* His weight at book in was 198. *Id.*

When he was booked in, he was provided a copy of the Benton County Detainee Rules and Detainee Rights. *Resp.* at ¶ 3. On January 17th Hinson requested a § 1983 form and was informed by jail personnel that the forms were not furnished by the jail. *Id.* at ¶ 4.

On January 19th Hinson requested a phone number for his employer and was told to contact a friend or family member. *Resp.* at ¶ 5. On January 22nd Hinson submitted a grievance about a failure to appear warrant. *Id.* at ¶ 6. He asked that the charge be removed because he was in custody on the court date. *Id.* In response he was told he was not being held on the charge. *Id.*

On January 30th Hinson asked for the address of the Benton County Prosecutor. *Resp.* at ¶ 7. He was provided it. *Id.*

On February 2nd he was locked down by Deputy Pop for having more than one Bible and two books in his cell. *Resp.* at ¶ 8. On February 4th Hinson submitted a grievance about having been locked down because he had too many Bibles and other books in his cell. *Defts' Ex.* 3 at page 7. In response, Captain Petray stated if Hinson requested an appeal the lieutenant would hear it. *Id.* Hinson points out that he was never issued a disciplinary action report and didn't

-2-

have a hearing. *Resp.* at ¶¶ 8 & 10.  After seventy-two hours, he states he was released from lock down. *Id.* at ¶ 10.

On February 2nd Hinson changed his emergency contact information to Hazel Hinson. *Id.* at ¶ 9.

On February 12th Hinson submitted a medical request. *Resp.* at ¶ 11.  He stated he had a filling fall out while confined at the BCDC and also a tooth break off at the gum. *Id.*  He asked for dental attention. *Id.*  In response he was put on the list to see the doctor. *Id.*

Hinson was seen by Dr. Huskins on February 15th. *Resp.* at ¶ 12.  He noted Hinson had significant dental caries and periodontal disease. *Id.*  Dr. Huskins also noted Hinson had some missing teeth and some cavities. *Id.*  Dr. Huskins prescribed saline rinses every day for seven days. *Id.*

Hinson asked for law library access on February 16th. *Resp.* at ¶ 13.  In response he was told to contact his attorney and the library was for those who did not have an attorney. *Id.*  Hinson maintains he has a constitutional right to research his case and help his attorney. *Id.*  He asserts he was denied this right. *Id.*

On February 18th Hinson submitted a grievance complaining that the doctor had refused to give him proper medication. *Resp.* at ¶ 14.  Hinson stated he had a tooth broken off at the gum line and a filling out yet Dr. Huskins had only given him salt water. *Id.*  In response Captain Petray said he would forward his grievance to medical. *Id.*  He stated the doctor made all medical decisions in the jail. *Id.*

On February 28th Hinson submitted a grievance about the overcrowding and unsanitary conditions as well as the meager amount of food he was getting. *Resp.* at ¶ 15.  He complained

-3-

Deputy Freeman was threatening the inmates with lock down if the noise level was not kept down. *Id.* In response, Captain Petray told Hinson to continue to follow the rules of the jail. *Id.*

Hinson asserts that the sixty-four bed D130 pod had eighty-four inmates detained in a small area for over ten hours each day. *Resp.* at ¶ 15. He states the inmates were locked out of their cells all day. *Id.* During the day, he states there was one toilet that all eighty-four inmates had to use. *Id.*

On March 6th Hinson submitted a grievance stating that it was his third regarding dental problems. *Resp.* at ¶ 16. He stated he was given salt water for a tooth ache. *Id.* He maintained this was not proper medication for the problem. *Id.* He asserted he was being denied proper medical attention. *Id.* In response, Captain Petray said he would forward Hinson's grievance to medical. *Id.* He said the doctor made the medical decisions in the jail. *Id.*

On March 10th Hinson submitted a medical request about his bottom bunk permit. *Resp.* at ¶ 17. He noted that he had been medically screened and authorized to have a bottom bunk because of his lower back problems. *Id.* However, he stated this information was no longer in the computer. *Id.* He asked that this matter be corrected and the computer system be updated. *Id.* In response, he was told it had been done. *Id.* Although he was seen by medical on January 22, 2008, and authorized to have a bottom bunk, Hinson states he was never allowed to move to a bottom bunk. *Id.*

On March 12th Hinson requested a status report on his application to become a trustee. *Resp.* at ¶ 18. Lt. Carter said he would look at Hinson's application. *Id.* Hinson states there was never any follow-up by Carter. *Id.*

-4-

On March 12th Hinson put in a medical request stating he had a sore throat, stuffy nose and aching body. *Defts' Ex.* 2, Vol. 1 at page 7. Hinson asked for cold medicine. *Id.* In response, someone wrote: "see doctor." *Id.* On March 14th Hinson again requested medical care for his cold. *Resp.* at ¶ 20. He stated he had not yet been given any medication. *Id.* In response, he was put on the list to see the nurse. *Id.*

On March 14th Hinson submitted a grievance stating he had not yet received dental attention. *Resp.* at ¶ 21. He noted this was the fourth time he had requested proper medical attention from a dentist. *Id.* In response, Captain Petray stated he would forward the grievance to medical. *Id.* He stated the doctor made all medical decisions in the jail. *Id.*

Hinson was seen by Dr. Huskins on March 17th for his complaints of dental pain and a head and chest cold. *Resp.* at ¶ 22. Dr. Huskins noted Hinson's mucous membranes were clear, his throat was clear, and his chest was clear. *Id.* Dr. Huskins noted Hinson had some dental caries but no significant periodontal disease. *Id.* He prescribed Amoxil 500 mg. three times a day for one week. *Id.* Hinson points out that Dr. Huskins had indicated he had periodontal disease on his prior visit. *Id.*

On March 18th Hinson requested his account verification form back. *Resp.* at ¶ 23. Captain Petray stated he signed the form. *Id.*

On March 20th Hinson complained it was too cold in the pod. *Resp.* at ¶ 24. In response, Captain Petray said he would check with maintenance. *Id.* According to Hinson, when the maintenance man Byron recorded the temperature in the pod on March 23 it was 53°F. *Id.* Hinson maintains the temperature in the pod was not raised until mid-April. *Id.*

On April 15th Hinson  submitted a grievance about dental problems and toothaches. *Resp.* at ¶ 25.  He asked if he had to file a lawsuit in order to obtain proper medical attention. *Id.*  In response, Captain Petray stated he would forward the grievance to medical.  *Id.*  He stated the doctor made the medical decisions in the jail.  *Id.*

On April 16th Hinson complained there were sixty-four inmates in the pod at all times and up to eighty inmates at times.  *Resp.* at ¶ 26.  He said they all had to share one common restroom all day.  *Id.*  He  stated this was not sufficient for so many people.  *Id.*  In response, Captain Petray stated he would see what he could do.  *Id.*  Hinson states they never opened an additional cell for toilet use while he was in the jail.  *Id.*

On April 23rd Hinson requested a hygiene shave.  *Resp.* at ¶ 27.  In response, he was told to ask a pod deputy.  *Id.*

On May 4th Hinson asked for a soft tray.  *Resp.* at ¶ 28.  Since he could not get any medical attention regarding his dental problems, he asked for a special tray because of bad teeth. *Id.*  In response he was put on the list to see the doctor.  *Id.*

On May 6th Hinson submitted a medical request for cold/flu symptoms.  *Resp.* at ¶ 29. He requested medication.  *Id.*  In response, he was put on the list to see the doctor.  *Id.*

Hinson was seen by Dr. Huskins on May 7th.  *Resp.* at ¶ 30.  He diagnosed Hinson with an upper respiratory infection and dental problems.  *Id.*  Dr. Huskins prescribed Amoxil for one week.  *Id.*

On May 8th Hinson submitted a medical request stating that he had been seen by Dr. Huskins on May 7th and was prescribed only an antibiotic.  *Resp.* at ¶ 31.  Hinson did not believe this was sufficient.  *Id.*  He stated he told the doctor he had an abscessed tooth.  *Id.*  He states he

-6-

asked for a soft tray because teeth are broken off at the gum line. *Id.* Although the soft tray had been approved, Hinson had not started receiving it. *Id.* Hinson asked for proper medical attention. *Id.*

Hinson was seen again on May 9th by Dr. Huskins. *Resp.* at ¶ 32; *Defts' Ex.* 2, Vol. 2 at pages 2 & 18. Dr. Huskins discontinued the Amoxil prescribed saline rinses for seven days and prescribed Bactrim or SMZ/TMP D's for a week. *Id.*

On May 22nd Hinson submitted a medical request complaining of a toothache. *Resp.* at ¶ 33. He stated he had it off and on for a month. *Id.* In response he was put on the list to see the doctor. *Id.*

Hinson was seen by Dr. Huskins on May 23rd prescribed saline rinses, a soft diet, and "extract." *Resp.* at ¶ 34.

On May 23rd Hinson submitted a medical request stating the salt water prescribed by the doctor was not helping relieve the pain. *Resp.* at ¶ 35. He asked if he could also be given Tylenol. *Id.* In response he was to see the nurse. *Id.* According to his jail medical chart, Hinson was seen by the nurse on the 28th and she authorized him to have Tylenol three times a day for seven days. *Defts' Ex.* 2, Vol. 2 at page 2. Hinson doesn't indicate whether or not he was seen, or even that he did not receive the medication. *Resp.* at ¶ 36. He just maintains it is not his initials on the medication form. *Id.*

On June 15th Hinson submitted a medical request complaining of cold/flu like symptoms. *Resp.* at ¶ 37. He was to see the nurse. *Id.*

According to his jail chart, Hinson was seen by the doctor and nurse for an upper respiratory infection on June 19th and prescribed Amoxil and Tylenol. *Defts' Ex.* 2, Vol. 2 at

AO72A
(Rev. 8/82)

page 3. Once again, Hinson does not deny he was seen and prescribed these medications. *See Resp.* at ¶ 38. However, he does, in the case of these medications, maintain he never received them. *Id.* He states the medication logs do not contain his initials. *Id.*

On June 23rd Hinson submitted a medical request complaining he was still having pain with the same toothache he had over the past five months. *Resp.* at ¶ 39. He stated Tylenol was no longer helping. *Id.* He asked to be taken to the dentist ASAP. *Id.*

According to Hinson's medical chart, he was seen by the nurse on June 26th and prescribed Tylenol three times a day for three days. *Defts' Ex.* 2, Vol. 2 at page 3. Hinson, however, states that he never received the medication. *Resp.* at ¶ 40. He maintains the medication sheet is a forgery of his initials. *Id.* referring to *Defts' Ex.* 2, Vol. 2 at page 4. Furthermore, Hinson states he was already on Tylenol. *Resp.* at ¶ 40.

On June 25th a request was sent to the Arkansas Department of Correction (ADC) for approval of fillings and/or dental extractions. *Resp.* at ¶ 41. Hinson was to be treated locally and ADC was to be billed for fillings and/or extractions. *Id.* Hinson maintains he was not treated before this time because the BCDC did not want to pay the costs associated with his treatment. *Id.*

Two of Hinson's teeth were extracted on June 27th and he was prescribed Amoxicillin. *Resp.* at ¶ 42. Hinson maintains the BCDC failed to adhere to the dentist's order regarding the Amoxicillin. *Id.* Hinson states he was to receive the antibiotic for thirty days but only received it for three days. *Id.* He maintains the initials on the medication sheet showing he received it after three days are not his. *Id.*

-8-

On July 18, Deputy Johnston was assigned to D-pod. *Resp.* at ¶ 43. Johnston was closing cell doors in D-153 because inmates were not coming out in a timely manner. *Id.*

According to the report written by Johnston, while Johnston was closing doors, Hinson shouted "jack—" as if he were shouting at Johnston. *Defts' Ex.* 4 at page 2. Hinson denies he ever shouted anything at Johnston. *Resp.* at ¶ 45.

Hinson requested to speak to a sergeant. *Defts' Ex.* 4 at page 2. When Johnston asked Hinson why he wanted to speak to a sergeant. *Id.* Hinson replied that he wanted to talk to a sergeant about Johnston's attitude. *Id. See also Resp.* at ¶ 47.

Hinson was then told to step outside and they would talk about it. *Defts' Ex.* 4 at page 2. *See also Resp.* at ¶ 48 (ordered outside and told Johnston would solve my request himself). Hinson locked his hands together behind his back. *Resp.* at ¶ 49. According to Hinson, inmates at the BCDC are ordered to keep their hands behind their back while talking to staff members. *Id.*

When Johnston attempted to get Hinson in a straight arm bar transport wrist lock, Johnston could not gain control of Hinson's left arm. *Defts' Ex.* 4 at page 2. Johnston states he then put Hinson in a wrist lock behind his back and escorted Hinson to pod control. *Id.*

Hinson, however, maintains Johnston, at the time of the incident, did not even know what a straight arm bar wrist lock was. *Resp.* at ¶ 50. Hinson maintains Johnston had not yet been trained. *Id.*

While he was being escorted to pod control, Hinson shouted: "You guys see this, he's beating me." *Resp.* at ¶ 52. When Hinson got to pod control, he maintains Johnston brutally forced him to his knees with his knee in Hinson's back. *Id.* at ¶ 53.

-9-

According to Johnston Hinson stated, "You will not have a job tomorrow." *Defts' Ex. 4* at page 2. Hinson, however, indicates he said nothing because he was in shock and disorientated from being slammed into the walls. *Id.*

Johnston reported that Corporal Morris arrived and ordered Hinson to quit talking. *Defts' Ex. 4* at page 2. Johnston stated Hinson complied with Morris' order. *Id.* Hinson denies that Morris was present at all during any of the time. *Resp.* at ¶ 56.

Hinson was then escorted to E-104. *Defts' Ex. 4* at page 2. According to Johnston, Hinson said: "You are going to be put in jail for assaulting me." *Id.* Hinson denies having made this statement. *Resp.* at ¶ 57. Instead, Hinson reports he said: "He will not get away with such abuse as long as there is any justice to be found." *Id.*

According to Johnston, he then informed Hinson he was being locked down for refusing to obey the order of a deputy. *Defts' Ex. 4* at page 2. Hinson states he was never told anything. *Resp.* at ¶ 58. If he resisted so much, Hinson questions why he wasn't charged and locked down for resisting and/or threatening a deputy. *Id.*

On July 18th Steven Samples, a fellow inmate of Hinson's, wrote a statement of facts. *Resp.* at page 49. He indicates he saw Johnston grab Hinson and throw him into the day-room wall, slam him into the pod exit door, and throw him through the door into the pod control wall. *Id. See also Statement of Jamie Perdue* at page 50 (similar to that of Samples); *Statement of Juan Othole* at page 51 (shoving Hinson to pod door, shoved him into the pod door, and against the wall in the pod control); *Statement of Tom Cunningham* at page 52 (ran him into the pod door and into the control room wall); *Statement of Tim McCauley* at page 53 (similar to that of Samples); *Statement of Jesse Jouett* at page 54 (slammed against pod door); *Statement of Leroy*

-10-

*Witcher* at page 55 (push into pod door and into control room wall); *Statement of Clifford Dutton* at page 56 (slammed into pod door and into control room wall).

On July 18th Hinson received a disciplinary for disobeying the order of a deputy. *Resp.* at ¶ 59. After a hearing, Hinson found guilty and given ten days lock down. *Id.* at ¶ 60. He appealed and the decision was affirmed. *Id.* Hinson states his complaint to Carter was never answered by anyone. *Id.* Hinson maintains "[t]hey knew that their deputy had crossed the line and they had to cover the incident by not responding and leaving a paper trail." *Id.*

On July 19th Hinson submitted a grievance stating he had been assaulted by Johnston the day before. *Defts' Ex.* 3 at page 34; *Resp.* at ¶ 61. He asked for a "protection order" to be placed against Johnston. *Id.* In response, Captain Petray stated the incident had been reviewed and Hinson was not assaulted. *Id.* He stated Hinson needed to follow the orders of the deputies and the rules of the jail. *Id.* Hinson states while he was on lock down, the whole pod sent Petray a grievance expressing their distaste for the actions of Johnston. *Resp.* at ¶ 61.

On July 19th Hinson submitted a medical request stating he no longer needed a soft tray since he had been to the dentist. *Resp.* at ¶ 62. However, he stated he still needed a no mustard tray. *Id.* In response, his request was okayed. *Id.* On July 21st a medical diet order was placed to put Hinson on a regular diet tray but with no mustard as he was allergic to it. *Defts' Ex.* 2, Vol. 1 at page 24; *Resp.* at ¶ 63 (not allergic as much as dislike).

Hinson was transferred to the ADC on August 6, 2008. *Resp.* at ¶ 64. He had been sentenced to a period of incarceration on March 31, 2008. *Id.* at ¶ 65.

Hinson was asked to describe how Dr. Huskins exhibited deliberate indifference to his serious medical needs. He responded:

-11-

> Huskins did not seek professional dental supervision after months of requests. Huskins was operating on orders from Ferguson and Petray to keep costs down no matter what so that Quarram Court would not see money used by Fergusons Dept. when he was due for reelection in Nov 08.  Huskins was controlled completely by Ferguson, Drake and Petray.  Huskins was not authorized to give all medical need the proper attention he would normally give to patients on the streets.  Under oath in open court, Huskins would tell the real story about the BCDC and its personel.

*Resp.* at ¶ 68.

With respect to Nurse Smith, Hinson was also asked to describe how she exhibited deliberate indifference to his serious medical needs.  He responded:

> She as well as Huskins condone the lack of proper medical attention to detainees as directed by Ferguson, Drake and Petray.  She was in fear of losing her job at BCDC if she went outside of orders from Ferguson, Drake and Petray.  Nurse Smith was only a pawn in the operation of BCDC and its direct officials.

*Resp.* at ¶ 69.

With respect to the meals, Hinson states all meals are served cold.  *Resp.* at ¶ 72.  While the menu describes nice meals containing such things as fresh fruit, tossed salad, turkey salad, potato salad, etc., he contains what you get isn't as nice.  *Id.*  For instance, he states the fresh fruit consists of one half of an orange "that has dried up from being left out for days or a cheap price being paid."  He indicated the tossed salad "consists of one to two pieces of small lettuce with no other ingredients."  *Id.*  The turkey salad, is "left over turkey loaf from days past."  *Id.*  The potato salad is "powered potatoes mixed with mustard and mixed until mashed potatoes."  *Id.*  With each meal you get four ounces of powered milk and four pieces of wheat bread.  *Id.*  Hinson contends many of the calories you receive come from the bread.  *Id.*

-12-

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor."  *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## III.  DISCUSSION

Defendants have moved for summary judgment on the claims against them.  They maintain there is no evidence excessive force was used against Hinson.  With respect to the conditions of confinement, they maintain Hinson was not subjected to any unconstitutional conditions of confinement.  In connection with the meals served in particular, they maintain the meals served are nutritionally adequate and Hinson's health has suffered in no way because the meals he receives are served cold.  Next, they maintain Hinson received adequate medical and

-13-

dental care.  Finally, they maintain there is no evidence of personal involvement on the part of Sheriff Ferguson, Major Drake, or Captain Petray.

### Excessive Force

On July 18, 2008, Hinson was in convicted status.  *Resp.* at ¶ 65.  "[T]he Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences."  *Wilson v. Spain*, 209 F.3d 713 (8th Cir. 2000)(*citing Whitley v. Albers*, 475 U.S. 312, 318-322, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)).  "The Eighth Amendment protects inmates from the unnecessary and wanton infliction of pain by correctional officers regardless of whether an inmate suffers serious injury as a result."  *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002)(citations omitted).  The Supreme Court has held that when "prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated."  *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992).

"Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the 'core judicial inquiry' is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Jones v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000) (*quoting Hudson*, 503 U.S. at 6-7).  To make this determination, the court is to consider, among other things, the following factors: "the need for the application of physical force; the relationship between the need for physical force and the amount of force applied; and the extent of injury suffered by the inmate." *Jones*, 207 F.3d at 495 (citations omitted).

-14-

The parties' give contradictory versions of what occurred between Johnston and Hinson on July 18, 2008.[1]  According to Hinson, he was slammed into walls twice and into the cell door once.  *See Resp.* at ¶ 50 and attached witness statements.  He also maintains he was brutally forced to the floor in the control room.  *Resp.* at ¶ 53.  In contrast, Johnston maintains he used an appropriate technique, a wrist lock behind Hinson's back, to escort a noncompliant inmate, to the control room and then pulled Hinson down to his knees.  *Defts' Ex.* 4 at page 2.

Regardless of which version of the events is what actually occurred, Hinson's excessive force claim fails.  To prevail on an Eighth Amendment excessive force claim, the plaintiff must have suffered actual injury.  *See e.g., Dawkins v. Graham*, 50 F.3d 532, 535 (8th Cir. 1995)(While significant injury isn't required, actual injury is.  Actual injury requirement satisfied where James sustained bruises and a facial laceration and was taken to the hospital,  Earnestine's knees were bruised and her blood pressure was elevated, and LaQuestia suffered from posttraumatic stress disorder.).  *See also United States v. Miller*, 477 F.3d 644,  647 (8th Cir. 2007)(O'Neil was taken to the emergency room for treatment.  His injuries consisting of a bruised and swollen left eye and a reddish-purple face.  Actual injury requirement satisfied).

In this case, Hinson neither sought, or received, any medical treatment for injuries sustained in the alleged assault.  Although Hinson submitted a medical request on July 19th, he merely stated he no longer needed a soft tray because he had been to the dentist.  *Resp.* at ¶ 62. He indicated he still needed a no mustard tray.  *Id.*  Hinson did not mention any injuries from the

---

[1]Hinson alleges inmates were beaten for having prayer.  When asked about this statement, Hinson responded that he was a witness to this.  *Resp.* at ¶ 73.   A claim that an individual's constitutional rights have been violated is regarded as personal in nature.  *See Broadrick v. Oklahoma,* 413 U.S. 601, 610-11, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973); *United States v. Mitchell,* 915 F.2d 521, 526 n. 8 (9th Cir. 1990).  Ordinarily, one individual cannot assert a claim on behalf of another individual.  *Johns v. County of San Diego,* 114 F.3d 874, 876 (9th Cir. 1997)("While a non-attorney may appear pro se on his own behalf, '[h]e has no authority to appear as an attorney for others than himself.'").  Hinson may not pursue this claim on behalf of other unnamed inmates.

AO72A
(Rev. 8/82)

alleged assault or ask for any treatment for any injuries. *Id.* Additionally, Hinson submitted a grievance regarding the assault. His grievance did not mention any injuries sustained as a result of the assault. *Id.* at ¶ 61.

### Conditions of Confinement

The Court of Appeals for the Eighth Circuit has adopted the same legal standard for detainees that applies to convicted inmates, thus the date of Hinson's conviction becomes irrelevant for purposes of determining whether defendants are entitled to summary judgment on this issue. *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006)(adopting the Eighth Amendment's deliberate indifference standard as the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety."

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII.

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).

-16-

"A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities.  The defendants' conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted).  Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels*, 382 F.3d at 875.  The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

Hinson contends his rights were violated by the conditions under which he was confined at the BCDC.   Specifically he complains about the following conditions:  overcrowding; cold meals that he believes are not nutritious; and cold temperatures in the cells.

The Supreme Court has stated that "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter*, 501 U.S. 294, 305, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991). However, "[c]onditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise–for example, a low cell temperature at night combined with a failure to issue

-17-

blankets." *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004)(*citing Wilson*, 501 U.S. at 304). The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

The Eighth Circuit has noted that conditions, "such as a filthy cell, may be tolerable for a few days and intolerably cruel for weeks or months." *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994)(internal quotation marks and citation omitted). The court considered both the length of time a prisoner must endure the filthiness and the level of filthiness. *Id.*

Hinson complains that pod D130 was a sixty-four man pod but had eighty-four inmates assigned to it. *Resp.* at ¶ 15 & ¶ 26. For ten hours each day, Hinson states the inmates were locked out of their cells and only had access to one toilet. *Id.* at ¶ 15. The summary judgment record does not indicate that Hinson was unable to utilize the toilet when it was necessary for him to do so, that lines formed for the use of the toilet, or that he was required to wait for long periods of time to use the toilet. *Patchette v. Nix*, 952 F.2d 158, 163 (8th Cir. 1991). On the record before the court there is simply no genuine issue of fact as to whether the overcrowding and lack of available toilet facilities during the day led to deprivations of essential food, medical care, or sanitation, nor increased violence among inmates. In short, we do not believe there is a genuine issue of fact as to whether Hinson was deprived of a single, identifiable human need. *See e.g., Tokar v. Armontrout*, 97 F.3d 1078, 1082 (8th Cir. 1996).

Next, Hinson contends his rights were violated by the diet he received at the BCDC. Hinson maintains the BCDC served only cold meals and the meals were not sufficiently nutritious. The Eighth Amendment's prohibition against cruel and unusual punishment is

violated if an inmate is not provided with meals adequate to maintain his health.  *See e.g.,*

*Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Campbell v. Cauthron*, 623 F.2d 503, 508

(8th Cir. 1980)(prisoners are guaranteed a reasonably adequate diet).  Merely because the food

is not prepared to an inmate's taste or the fact that an inmate would prefer other foods does not

implicate the Eighth Amendment.  Rather, the Eighth Amendment is only violated if the food

provided is inadequate to maintain good health.  *See e.g., Burgin v. Nix*, 899 F.2d 733, 734-35

(8th Cir. 1990)(inmates do not have a right to be served a particular type of food).

"The deprivation of food constitutes cruel and unusual punishment only if it denies a

prisoner the 'minimal civilized measure of life's necessities.'" *Talib v. Gilley*, 138 F.3d 211, 214

n. 3 (5th Cir. 1998)(expressing doubt that Talib who missed about fifty meals in five months and

lost fifteen pounds met this threshold)(*quoting Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct.

2321, 115 L. Ed. 2d 271 (1991)).  "Whether the deprivation of food falls below this threshold

depends on the amount and duration of the deprivation."  *Green v. Ferrell*, 801 F.2d 765, 770

(5th Cir. 1986).

In this case, Hinson has failed to show a genuine issue of material fact exists as to

whether his constitutional rights were violated by the diet he was provided while at the BCDC.

The fact that Hinson was served only cold food does not state a claim of constitutional

dimension.  *See e.g., Brown-El v. Delo*, 969 F.2d 644, 648 (8th Cir. 1992); *Smith v. Copeland*,

892 F. Supp. 1218, 1229 (E.D. Mo. 1995)(holding that diet of only cold food, in and of itself,

does not offend the Constitution).  Although Hinson has made the conclusory allegation that the

meals served were not nutritious, there is no evidence that the food Hinson was served was

nutritionally inadequate or prepared in a manner presenting an immediate danger to his health

-19-

or that his health suffered as a result of the food.  *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992).   In fact, on several occasions, Hinson's requests for modifications to his diet were complied with.  *See e.g., Resp.* at ¶ 31 (request for soft diet); *Resp.* at ¶ 62 (request for regular diet but without mustard).  On neither of these occasions did Hinson complain of the quality or quantity of food he was receiving.  *Id.*

Finally, on March 20th Hinson complained it was too cold in the pod.  *Resp.* at ¶ 24.  In response, Petray stated he would check with maintenance.  *Id.*  Petray apparently did report Hinson's complaint to maintenance because Hinson indicates the maintenance man checked the temperature in the pod on March 23rd.  *Id.*  Hinson, however, states the temperature when checked was only 53° and was not raised until mid-April 2008.  *Id.*

While Hinson alleges he was subjected to cold temperatures, there is nothing in the summary judgment record to suggest he was not provided with clothing and bedding adequate to protect him against the cold.  In short, there is no genuine issue of fact as to whether he suffered the level of objectively serious harm necessary to show an Eighth Amendment violation.  *See e.g., Dixon v. Godinez*, 114 F.3d 640, 642-44 (7th Cir. 1997)(prisoner with inadequate clothing or bedding could not keep warm in cell with average temperature of forty degrees).

### *Denial of Medical Care*

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard.  *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).  To prevail on an Eighth Amendment claim, Hinson must prove that defendants acted with deliberate indifference to his serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference

-20-

standard includes "both an objective and a subjective component:   'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'"  *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting  Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even that gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation.   Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct."  *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

"Dental conditions, like other medical conditions, may be of varying severity."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2nd Cir. 1998).  In this case, Hinson first sought treatment for a dental condition on February 12th.  *Resp.* at ¶ 11.  He said he had a filling that had fallen out and he also had a tooth that broke out at the gum.  *Id.*  Hinson was seen by Dr. Huskins on February 15th.  *Defts' Ex.* 2, Vol. 1 at page 5.  Dr. Huskins noted that Hinson had significant dental caries and periodontal disease.  *Id.*  Dr. Huskins also noted Hinson had some missing teeth and some cavities.  *Id.*  Dr. Huskins prescribed saline rinses for seven days.  *Id.*

Hinson continued over a period of several months to submit medical requests and grievances regarding his broken tooth and/or toothaches.  *See Resp.* at ¶¶ 14 (February 18th); 16 (March 6th); 21 (March 14th); 25 (April 15th); 28 (May 4th); 31 (May 8th); 33 (May 22nd); 35 (May 23rd); 39 (June 23rd).  While Hinson was seen by Dr. Huskins on several  occasions and

-21-

prescribed saline rinses and antibiotics, he was not referred to a dentist until late May or June. *Defts' Ex.* 2, Vol. 2 at page 2 and *Defts' Ex.* 2, Vol. 1 at page 15. Hinson was finally seen by a dentist on June 27th. *Defts' Ex.* 2, Vol. 2 at page 19.

We believe there is a genuine issue of material fact as to whether Dr. Huskins and Nurse Smith knew of, yet deliberately disregarded, Hinson's serious dental needs. *See e.g., Moore v. Jackson*, 123 F.3d 1082, 1084-87 (8th Cir. 1997)(issue of fact existed whether inmate repeatedly reported severe tooth pain in medical service requests and grievances but care was delayed from April to December); *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995)(three-week delay in dental care, coupled with knowledge that inmate was suffering, can support Eighth Amendment violation); *Patterson v. Pearson*, 19 F.3d 439, 440 (8th Cir. 1994)(summary judgment reversed whether there was evidence that dentist learned of inmate's tooth-related swelling, headache, and severe pain on March 19, but did not remove tooth until April 15).

There is no evidence in the record that Sheriff Ferguson or Major Gene Drake were involved in anyway in the processing of any of Hinson's requests for dental treatment or his grievances about the lack of dental treatment. Nor is there any evidence they made any decisions regarding when, or if, he should be sent to a dentist for treatment. Instead, Hinson merely alleges that no one can assume Sheriff Ferguson was "unaware of anything that did or did not happen in BCDC." *Resp.* at ¶ 70. With respect to Major Drake, Hinson states he wrote him a letter dated June 8th "detailing the assault and why [he] was not being afforded dental treatment." *Id.* at ¶ 71.

This is simply insufficient to establish liability under § 1983. "To establish personal liability of the supervisory defendants, [Hinson] must allege specific facts of personal

-22-

involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007)(internal quotation marks and citation omitted). "[G]eneral responsibility for supervising the operations of a prison is insufficient to establish personal involvement." *Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987). There is simply no genuine issue of material fact as to Sheriff Ferguson's or Major's Drake's liability for the delay in Hinson's receipt of dental care.

Captain Petray was involved in the receipt of, and response to, the grievances. Without a doubt, Petray knew Hinson was seeking and complaining about not receiving adequate dental care over a period of several months. However, it is also obvious from both the grievances and Petray's response that he took no part in the decisions regarding the medical and/or dental care Hinson should receive and merely referred Hinson back to the medical staff. *See e.g., Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)(A non-medical prison official is not charged with deliberate indifference for withholding adequate medical care from a prisoner being treated by medical personnel absent "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner."). *See also Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997)(Non-medical supervisor who was not involved in treatment decisions made by the medical unit staff lacked medical expertise and cannot be liable for the medical staff's diagnostic decisions. Claim must be brought against the individuals directly responsible for the medical care.); *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993)(non-medical professional not deliberately indifferent for failing to respond to inmate's complaints when prisoner is ostensibly under care of medical expert).

-23-

## IV.  CONCLUSION

I therefore recommend that the motion for summary judgment (Doc. 29) be granted in part and denied in part.  Specifically, I recommend the motion be granted with respect to Hinson's excessive force claim and his unconstitutional conditions of confinement claim.  This would dismiss all claims against Deputy Zachary Johnston.  I further recommend that all claims against Sheriff Keith Ferguson, Major Gene Drake, and Captain Hunter Petray be dismissed.  Finally, I recommend the motion be denied with respect to Hinson's denial of adequate dental care claim against Dr. Huskins and Nurse Smith.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 4th day of August 2009.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-24-